**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0082-2 (CJN)** |
| **v.** | : | |
| | : | |
| **TROY WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Troy Williams ("Williams") to thirty days incarceration, three years' probation, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

The defendant, Williams, a close friend, and co-defendant, Dalton Ray Crase ("Crase"), all traveled together from Kentucky to Washington, D.C. on January 5, 2021 to attend the Trump Rally. After their mutual friend became sick and had to go to the hospital, defendants Crase and Williams then attended the rally together at the Ellipse the next day, and then participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Both Crase and Williams entered the U.S. Capitol Building twice on January 6, 2021, and both pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or

1

Picketing in the Capitol Building.  As explained herein, a sentence of thirty days incarceration with three years' probation is appropriate in Williams' case because: (1) he and Crase initially entered the U.S. Capitol Grounds after they both saw violence against law enforcement and clear evidence that the area was restricted, and then entered the U.S. Capitol Building through a door that had been broken open less than one minute earlier; (2) he and Crase jointly re-entered the U.S. Capitol Building a second time during the riot;; (3) while they were inside the Capitol the second time, Crase and Williams discussed the riot as a warning to those who were opposed to the rioters, with Williams telling Crase (who agreed) that the riot was intended "just to let them know that when push comes to shove, we will fight.  We will just walk into this bitch . . . . Just showed them, *this is a taste, and if things don't change, we'll make a change*" (emphasis added); (4) after Crase and Williams watched other rioters violently force their way inside the U.S. Capitol Building, and followed them inside, Crase and Williams chanted with other rioters as they observed further violence by other rioters against law enforcement in the building; (5) both defendants Crase and Williams remained on Capitol grounds after leaving the U.S. Capitol Building the second time and even after they knew a State of Emergency had been declared (with a city-wide curfew); (6) the defendants did not leave the Capitol Grounds until tear gas and flash grenades were deployed by police to try and get the mob to disband; and (7) Williams admitted that he knew on January 6th that entering the U.S. Capitol during the January 6 riot was wrong.  These factors demonstrate that defendant Williams is not among the least culpable Capitol Rioters who entered the U.S. Capitol Building, and that this Court should fashion a sentence that treats them accordingly.

Importantly, the Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officials, breach the Capitol, and disrupt the

proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the Electoral College certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan at sentencing). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, which further renders the requested split sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Williams' Statement of Offense at 1-7. As this Court knows, the mob summoned to the U.S. Capitol Building turned into a violent riot against the police and our democracy, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Williams' Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, defendants Crase and Williams traveled to Washington, D.C., from their homes in Kentucky to attend the "Stop the Steal" rally.  After attending the former President's rally, the defendants went to the U.S. Capitol and onto the grounds. Along the way, they observed (and defendant Williams photographed and videotaped) trampled barricades that warned the rioters that the area they were crossing into was restricted.  As Defendants Williams and Crase crossed into the Capitol Grounds, Williams can be heard on video stating to Crase, "we just totally breached the wall, people have knocked down all the fences, they ain't stopping this."  Exhibit 1

(MVI_1528 video taken by defendant Williams, with time stamp of 2:15 p.m.) at 0:00 to 0:15.[1] As they moved toward the U.S. Capitol, defendant Williams pointed at the U.S. Capitol and told defendant Crase, "let's keep going, let's get up on this bitch." Exhibit 1 captured rioters climbing up the building, as the defendants observed that they rioters had gained access to the top of the U.S. Capitol.

 As they traveled up the steps of the U.S. Capitol, another Williams' video shows Williams and Crase together observing rioters attacking the Senate Wing Door and Entrance to the U.S. Capitol and rioters confronting law enforcement, who are deploying OC spray at the rioters, while other rioters yell "Stop the Steal!" *See* Exhibit 2 (MVI_1543 video taken by defendant Williams, time stamped 2:43) at 01:15 to 2:45. While they were filming, defendants Crase and Williams observed rioters exiting the U.S. Capitol through windows and doors, and another rioter told defendants Crase and Williams, "we busted the doors down" and "busted the windows" and that rioters had been inside and on the floor of the Congress for 30-45 minutes. *Id.* at 2:10- 3:00. Before entering the U.S. Capitol Building, defendant Williams videotaped (while standing next to defendant Crase) a rioter using a window cleaning hoist to move up to the second floor of the U.S. Capitol Building and jumping onto a ledge to attempt to break into the window with a metal pipe-shaped object to gain entry (metal object circled). *See* Exhibit 3 (MVI_1548 video taken by defendant Williams, time stamped at 2:49 p.m.), with still images from that video at Images 4-6, at time 00:30 to 1:05.

---

[1] The government will provide the video Exhibits as attachments to the Court and counsel (via USAFx or other method), but not images. Images can be provided separately upon request, and the government will file a separate notice to identify which videos it intends to play at sentencing.



**Image 4**



**Image 5**

As they watched, another crowd of rioters was actively pushing officers from another entrance to the U.S. Capitol Building (Parliamentarian's Door on the West Side of the U.S. Capitol) and yelling "Push!" and "They can't take all of us!"  Exhibit 3 at time mark 01:07 to 02:07.  Exhibit 3 captured the audio of these statements, and as defendant Williams pointed the camera to that door, the video shows both defendants Crase and Williams follow the rioters through the newly forced open doors while sirens blared from the door having been forced open.  A publicly

available video shows a rioters using a metal cane to break open the door, and it captures the initial

forced entrance into the door by other rioters.  *See* Exhibit 7 (video entitled "Crowbarbeardguy at

Parliamentarian Doors" at 0:00 to 0:24).  Closed Circuit video cameras of the Parliamentarian's

Door (showing that same period that is on Exhibit 3) show the rioter breaking into the building

against resistance from several officer who are trying to stop them.  Images from this CC video

camera showing this violent entry are at Images 8-12:







**<u>Image 10 (Rioters confronting Officers with Door Open)</u>**



**Image 11- Entry of Rioters Into Hallway- (note red circle- man with red, white and blue ski cap with long beard, and man in red cap behind him)**



**Image 12- Entry of Crase and Williams - 50 seconds after Image 9 (Red Circle)**

The video taken by defendant Williams (Exhibit 3), with Crase by his side, captures this moment of entry by the rioters, as defendant Williams' shifted his video to the newly opened door and recorded other rioters push through the enter the doorway as they rush to do the same.  In fact, Image 6 (from Exhibit 3) captured the back of the heads of the rioters circled in Image 10.



**Image 6 from Williams Video Exhibit 3 (Red circle showing read hat and red, white and blue ski cap with man with long beard)**

Defendants Crase and Williams immediately moved to enter the same door approximately

50 seconds after the door was violently breached, and the initial rioters pushed through the officers

who tried to stop the rioters from gaining entry.  Once inside, other rioters kicked open the door to

the Parliamentarian's Office, which at that point had been evacuated.

Immediately upon entry, Exhibit 3 captured the audible siren from the door and defendant

Crase's face showing surprise.  As Williams continued to record video, they observed rioters enter

the Parliamentarian's office inside the U.S. Capitol and appear to take items and damage the room.

Exhibit 3 at 2:00 to 2:35.  Defendant Williams commented to defendant Crase while inside, "this

is not right," but both he and Crase stayed inside the U.S. Capitol Building and moved further

toward the House and Senate chambers with other rioters. *Id.* at 2:10 to 2:45.  There, the video recorded the defendants observing other rioters attempting to break into other rooms, *id.* at 2:40, and other rioters yelling at officers to let them through the passageway while accusing the officers of turning on them, *id.* at 3:15 to 7:00.  Defendants Crase and Williams can also be heard yelling loudly in the hallway, "USA!!" and other chants.  *Id.*  At approximately 7:10 mark in the video, the police in the hallway deployed chemical spray and defendant Williams told defendant Crase that he doesn't agree with what is happening, and they moved back toward the entrance.  *Id.*  While still inside, the video captured the defendants talking with other rioters about their knowledge that the Mayor of Washington, D.C. has issued a city-wide curfew starting at 3:00 p.m.  *Id.* at 8:30-9:00.[2]  Defendants Crase and Williams stayed inside the building for several more minutes watching rioters yell and parade inside.  After watching additional law enforcement officers arrive on scene, defendants Crase and Williams left the building at the end of the video (11:14), after approximately 9 minutes, at 2:48 p.m.

Despite knowing violence was afoot, that a state of emergency had been declared (with a city-wide curfew), and they were not welcome inside the U.S. Capitol Building, defendants Crase and Williams walked around the side of the building and again entered the U.S. Capitol Building at approximately 3:07 p.m. through the same doors they had seen under assault before going into the U.S. Capitol- that is the Senate Wing Doors and Entrance on the Northwest side of the U.S. Capitol.  *See* Exhibit 13 (video taken by Williams, MVI_1555, time stamped at 3:07 p.m.).  Inside they observed broken furniture and property inside the building.  Defendant Crase took numerous

---

[2] This information was partially correct.  D.C. Mayor Muriel Bowser made a public announcement of an immediate State of Emergency, based on the attack on the Capitol, at approximately 2:30 p.m., but the city-wide curfew was ordered to be in effect at 6:00 p.m. (1/6).  *See* D.C. Mayor's Order 2021-002 and 2021-003 (January 6, 2021).

selfies and posed for pictures inside the hallway (and even in a bathroom), and even lit a cigarette.

*Id.* Image 14, 15, and 16 (photos recovered from the cameras of Crase and Williams).



**Image 13**



**Images 15 and 16**

Another video taken by defendant Williams during their second unlawful intrusion inside the U.S. Capitol Building captured a conversation between both defendants. The video captured defendant Williams telling defendant Crase that while "most" of the rioters inside the U.S. Capitol didn't want to hurt anybody, they were present, "just to let them know that when push comes to shove, we will fight. We will just walk into this bitch . . . . Just showed them, this is a taste, and if things don't change, we'll make a change." Exhibit 17 (Video taken by Williams, MVI_1559, time stamped 3:10 p.m.) at mark 0:00 to 0:32. Defendant Crase verbally agreed with defendant Williams as they continued talking together. The defendants then continued to walk through the first floor, into the Crypt area, and then into a bathroom where they relieved themselves. The defendants then left the U.S. Capitol Building sometime between 3:15 and 3:25 PM (for a total time inside the second time of between 8 and 18 minutes). Their departure from the building did not mean their participation in the mob had ceased: after leaving they stayed outside near the

entrance watching (and recording) additional violence by rioters against the police, until approximately 5:00 PM. This includes Exhibit 18 (video taken by Williams, MVI_1574, time stamped 4:21 PM), which shows the defendants watching the police push back the crowd and deploy tear gas to disperse the crowd.

In total, the defendants knew violence was occurring at the U.S. Capitol, moved toward the violence, they then made two entries into the U.S. Capitol Building through entrances where they knew violence was used to overtake those entrances, associated themselves with violent intruders into the Capitol, and engaged in breathtakingly brazen criminal conduct in the Capitol Building that impeded and disrupted the orderly conduct of a session of Congress.

*Williams' Interview*

The FBI contacted defendant Williams several days after the January 6th attack. Defendant Williams came to the FBI Lexington office on January 20, 2021 and agreed to a voluntary interview. In that interview defendant Williams stated that he and defendant Crase went to the rally at the Ellipse and then walked with a large crowd to the U.S. Capitol. Williams admitted that he and Crase observed several barricades which had been knocked over and were laying on the ground. And that they entered the U.S. Capitol Building with several other people after the riots started. According to Williams, he went in because of a "herd mentality." According to defendant Williams, he observed violence, but he did not take part in any violence or vandalism while inside the building. Defendant Williams was also asked if he ever felt he was doing anything wrong by being inside. He responded, "To a degree", and "I wasn't doing anything wrong or inciteful", and "We were a part of something, there's cops here, they tried to stop us, they are not letting us in, but not fighting us." Defendant Williams also recalled talking to two elderly gentlemen outside

of the Capitol building who said they were not going inside because it would be a felony. Defendant Williams heard this and told agents he thought to himself that they were probably right.

*The Charges and Plea Agreement*

On February 1, 2021, defendant Williams was arrested on four misdemeanors via complaint, and he was charged by information on February 4, 2021 with one count each of violating: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds)– Count 1; 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds)–Count 2; 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds)–Count 3; and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building)–Count 4.  Defendant Williams was released on his own recognizance with special conditions.  On October 14, 2021, defendant Williams pled guilty to Count Four of the Information, that is violating 40 U.S.C. §§ 5104(e)(2)(G).  By plea agreement, defendant Williams agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a significant period of a split sentence of thirty days incarceration, followed by a period of three years' probation.[3]

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

---

[3] The general prohibition against sentences that combine continuous incarceration and a term of probation, *see* 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, *see* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  Willful violations of law amidst a declared state of emergency, as well as multiple re-entries into the U.S. Capitol Building during the attack, are similarly important factors.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's failure to personally engage in violence and property destruction accounts for his plea to only a misdemeanor rather than felony.

Defendant Williams' crossed onto the U.S. Capitol Grounds after viewing violent rioting and saw trampled barricades that formerly protected the U.S. Capitol.  As the video exhibits show, and which has he has acknowledged in his Factual Proffer at ¶ 8, defendant Williams was specifically aware of attacks on the building and violence between rioters and law enforcement

officers before entering the building, and he witnessed repeated confrontations with law enforcement inside the Capitol.   By way of example, in Exhibit 3, defendants Crase and Williams saw law enforcement deploy OC spray inside the Capitol Building during their first trespass into the building.

Moreover, defendant Williams entered the U.S. Capitol Building where the Congress was counting ballots for the Electoral College, and he did so approximately fifty seconds after that door had been violently breached.   As part of the vanguard of rioters through this door, he saw police officers blocking the rioters' path, and there were clear signs of violent entry.   Indeed, defendant Williams repeatedly voiced his concerns about what was happening to defendant Crase, yet they still entered and remained in the U.S. Capitol.   Despite see all of that, they re-entered the U.S. Capitol again even after knowing that a state of emergency had been ordered.   The fact that they knew what was happening was wrong, yet they still persisted, shows they were not merely gawkers or thrill seekers during the riot and supports a sentence of incarceration.

To his credit, defendant Williams did not lie to the FBI, and he agreed to meet with the FBI just a week after the incident occurred.   This statement was not remorseful, however.   He voluntarily shared his photographs and video footage from his phone. He acknowledged that he went inside the U.S. Capitol (twice) and that he knew it was not right.   He also accepted responsibility early in this process.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence that will adequately punish the defendant for his conduct.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, defendant Williams has one prior domestic violence arrest in his history, but no convictions.   He has also been compliant with his conditions of pre-trial release.

Defendant Williams has maintained stable employment, he lives with his mother, and has a positive monthly cash flow.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration. Many of the January 6 rioters intended that their breach of the Capitol on January 6 to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Defendant Williams knew what he was doing was wrong at the time it was happening, yet he did it anyway. He also stated to defendant Crase in his conversation inside the U.S. Capitol (the second time) that they were there to show people what will happen if things don't change, and that they would then be back. This threat of future violence indicates that the Court needs to

21

sentence the defendant sufficiently to ensure that the defendant will not commit this crime again. To be fair, since being approached by law enforcement he has shown contrition and some level of remorse, but it appears that much of that remorse is based in failing to change the election results and in getting arrested. In order to deter defendant Williams from ever engaging in this conduct again, the government believes that an adequate sentence in this case must have a significant element of detention.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6]  Indeed, the government invites

---

[5]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

"fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same exact balance of aggravating and mitigating factors present here, the government believes its recommendation for incarceration is in accord with other misdemeanor cases which involve similar aggravating factors – where the

government sought and received incarceration sentences – rather than those cases where the government has sought home detention or probation.  For example, in *United States v.  Glen Wes Lee Croy*, 21-CR-162 (Howell, C.J.), a misdemeanor case, the government requested 60 days incarceration, and defendant was sentenced to 14 days community incarceration with 90 days home confinement, and three years' probation on November 5, 2021.  In *Croy*, the defendant was not involved in any violence against officers, but he entered the U.S. Capitol twice.  Chief Judge Howell found reason to distinguish this case from other misdemeanor pleas because of additional aggravating factors, including the fact that the defendant entered the U.S. Capitol Building twice, and specifically held that, "It is an aggravating circumstance in this case that this defendant made a deliberate choice to follow the mob twice in the Capitol Building."  Exhibit 19, Transcript of Nov. 5, 2021 Sentencing at p.86.[7]  Unlike the case at bar, the *Croy* case involved a defendant who had a son with diabetes, who did not witness violence inside the Captiol, who provided new information to the government about another – uncharged- rioter, and that case did not involve statements by the defendant that he believed that future violence may be appropriate.

This case is also more serious than other misdemeanor Capitol Riot sentencings before this Court who received sentences of probation with varying terms of home confinement.  *United States v. Thomas Gallagher*, 21-CR-0004, *United States v. Jonathan Sanders*, 1:21-CR-00384, *United States v. Cindy Fitchett*, 21-CR-00041-CJN, *United States v. Douglas Sweet*, 21-CR-00041, and *United States v. Terry Brown*, 21-CR-00041, involved defendants who entered the U.S. Capitol

---

[7] Similarly in *United States v. Robert Reeder*, 21-CR-166 (Hogan, J.), the defendant entered the U.S. Capitol building multiple times, and the government initially asked for 60 days incarceration.  However, prior to sentencing, the government learned that the defendant had engaged in an assault on an officer, and the government changed its allocution to a maximum, six-month sentence of incarceration.  Judge Hogan sentenced Reeder to 3 months incarceration.

Building only once for a short duration, did not know a state of emergency had been declared, and, most significantly, did not make statements justifying future violence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Troy Williams to thirty days incarceration, three years of supervised probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW G. GRAVES
UNITED STATES ATTORNEY


By: _____/S/_____
TEJPAL S. CHAWLA
Assistant United States Attorney
D.C. Bar 464012
555 4th Street, N.W.
Washington, D.C. 20530
202-252-7280 (Chawla)
Tejpal.Chawla@usdoj.gov